# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WASEEM KHAN, Individually and on Behalf of All Others Similarly Situated, ) ) | No. _____ |
| ) ) | COMPLAINT FOR VIOLATION OF THE |
| Plaintiff, ) ) | FEDERAL SECURITIES LAWS |
| vs. ) ) | |
| XCERRA CORPORATION, ROGER W. BLETHEN, DAVID G. TACELLI, MARK S. AIN, ROGER J. MAGGS, JORGE TITINGER and BRUCE R. WRIGHT, ) ) ) ) ) | |
| Defendants. ) ) | |
| ) | DEMAND FOR JURY TRIAL |

Plaintiff, by the undersigned attorneys, individually and on behalf of all others similarly situated, respectfully brings this class action for violations of §§14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, against the herein named defendants and alleges the following:

## SUMMARY OF THE ACTION

1.      This is a stockholder class action brought on behalf of the holders of Xcerra Corporation ("Xcerra" or the "Company") common stock against Xcerra and its Board of Directors (the "Board") for violations of federal law arising out of a false and misleading proxy statement recommending the sale of the Company to certain affiliates of Sino IC Capital Co. Ltd. ("Sino IC Capital") for $10.25 per share (the "Acquisition" or "Merger"), in violation of §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

2.      Xcerra is a Massachusetts company supplying semiconductor and electronics test equipment.

3.      In the years preceding the Merger, Xcerra consistently told investors that it was confident in its long-term growth strategy. The Company's management stated that they had a plan to double the Company in 3-5 years. The Company's management repeatedly stated that the Company was just in the beginning stages of its growth story, that the Company saw plenty of opportunities and was well-positioned to ramp up and achieve its long-term growth prospects in the coming years.

4.      The Company's management changed its tune when Sino IC Capital – a Chinese private equity fund – began negotiating for a go-private sale of the Company. For defendant David G. Tacelli ("Tacelli"), the Company's President and Chief Executive Officer ("CEO") and his management team, a go-private transaction with Sino IC Capital represented an opportunity to retain

their positions in the Company, cash out tens of millions of equity awards and other change in control benefits, and obtain new equity interests in the post-merger private company.

5.       However, the Company's expected growth trajectory (as well as the Company's climbing stock price) did not support the $10.25 per share consideration being offered by Sino IC Capital.  Thus – after agreeing to exclusivity with Sino IC Capital, shortly before agreeing to the Merger Agreement, and specifically for the purposes of the Merger – the Company's management developed a set of five-year projections which assumed that the Company will grow only in the first few years, but then, experience an abrupt cliff-drive in growth, with a 2% growth rate – slower than the current GDP – for the last three years.

6.       Based on these unreasonable and unrealistic projections – referred to in the Proxy (as defined below) and herein as the Extended Forecast – Cowen and Company, LLC ("Cowen") valued the Company's stock at $8.85 to $11.04 and opined that the $10.25 price was financially fair to the Company's stockholders.  And pointing to this fairness opinion, defendants agreed that the Merger was "was in the best interests of the company and its stockholders."

7.       On April 10, 2017, Xcerra and Sino IC Capital announced the Agreement and Plan of Merger (the "Merger Agreement") pursuant to which Unic Capital Management Co., Ltd. ("Unic Capital") – an affiliate of Sino IC Capital – would acquire all outstanding shares of Xcerra for $10.25 per share.[1]  On August 4, 2017, Unic Capital assigned their rights under the Merger Agreement to Hubei Xinyan Equity Investment Partnership (Limited Partnership) ("Parent").[2]

---

[1]    Unic Capital is a Chinese capital and asset management firm founded in 2016.

[2]    Parent is a Chinese limited partnership formed in 2017 as a buy-out investment fund established solely for the purpose of engaging in the transactions contemplated by the Merger Agreement.  Unic Capital is the controlling shareholder of the general partners of Parent.

8.      On September 5, 2017, defendants issued the Definitive Proxy Statement on Schedule 14A (together with all amendments, the "Proxy"), recommending that Xcerra shareholders accept the $10.25 per share offer and vote in favor of the Acquisition.

9.      In the Proxy, defendants stated that the Extended Forecast reflected management's best estimates concerning the future performance of the Company.  As detailed below, this statement was false and misleading as the growth trajectory assumed in the Extended Forecast was unrealistic and unreasonable, as demonstrated by the Company's performance and the numerous statements by defendant Tacelli and his management team in the years preceding the Merger.

10.     This false and misleading statement (as well as other defects in the Proxy discussed herein) prevented the Company's shareholders from making a fully informed decision on Merger and induced the Company's shareholders into accepting an offer that was unfair compared to the actual intrinsic value of the Company.

11.     Defendants' violations of §§14(a) and 20(a) of the 1934 Act harmed Xcerra's shareholders.  Thus, plaintiff seeks damages to remedy defendants' violations of §§14(a) and 20(a).

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the claims asserted herein pursuant to §27 of the 1934 Act for the violations of §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

13.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this District pursuant to 28 U.S.C. §1391, because Xcerra's headquarters are located 825 University Avenue, Norwood, Massachusetts 02062, and defendants include persons who are believed to reside this District.

## PARTIES

15.     Plaintiff Waseem Khan is and was, at all times relevant hereto, a shareholder of Xcerra.

16.     Defendant Xcerra is a Massachusetts corporation headquartered in Norwood, Massachusetts.

17.     Defendant Roger W. Blethen ("Blethen") is and was at times relevant hereto, a member and Chairman of the Board.  He has served as a Board member since 1980 and the Chairman since 2008.

18.     Defendant Tacelli is and was at times relevant hereto, Xcerra's President and CEO and a member of the Board.  He has served as a Board member and CEO since 2005.  He has served as President since 2002.

19.     Defendant Mark S. Ain ("Ain") is and was at times relevant hereto, a member of the Board.  He has served as a Board member since 2001.

20.     Defendant Roger J. Maggs ("Maggs") was at times relevant hereto, a member of the Board.  He has served as a Board member since 1994.

21.     Defendant Jorge Titinger ("Titinger") is and was at times relevant hereto, a member of the Board.  He has served as a Board member since 2012.

22.     Defendant Bruce R. Wright ("Wright") is and was at times relevant hereto, a member of the Board.  He has served as a Board member since 2008.

23.     The defendants named above in ¶¶17-22 are sometimes collectively referred to herein as the "Individual Defendants."

- 4 -

## CLASS ACTION ALLEGATIONS

24.    Plaintiff brings this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of holders of Xcerra common stock who are being and will be harmed by defendants' actions described below (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendants.

25.    This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

26.    The Class is so numerous that joinder of all members is impracticable.  According to Xcerra's SEC filings, as of August 23, 2017, there were more than 54 million shares of Xcerra common stock outstanding.

27.    There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following:

(a)    whether defendants have disseminated a false and misleading proxy statement in violation of §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder; and

(b)    whether misstatements in and/or omissions from the Proxy caused injury to plaintiff and the Class.

28.    Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

29.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

30.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

31.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

32.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## THE PROPOSED ACQUISITION

**Xcerra's Products and Services**

33.     Xcerra is a parent company of four powerful brands that have been supplying innovative products and services to the global semiconductor and electronics manufacturing industry for more than 30 years.  Xcerra's four brands are: (i) LTX-Credence; (ii) atg Luther & Maelzer; (iii) ECT; and (iv) Multitest.

34.     Xcerra divides its operations into two major segments: (i) semiconductor test solutions ("STS"); and (ii) electronic manufacturing solutions ("EMS").  The STS segment is comprised of Semiconductor Test, Semiconductor Handlers, and Contactors operating segments.[3] The EMS segment is comprised of the printed circuit board ("PCB") Test, Probes / Pins, and

---

[3]     The Semiconductor Test segment includes operations related to the design, manufacture and sale of automated test equipment ("ATE") for the semiconductor industry that is used to test system-on-a-chip, digital, analog and mixed signal integrated circuits.  The Semiconductor Handlers segment includes operations related to the design, manufacture and sale of test handlers used in the testing of integrated circuits.  The Contactors segment includes operations related to the design, manufacture and sale of test contactors which serve as the interface between the test handler and the semiconductor device under test.

Fixtures operating segments.[4]  Each operating segment has a segment manager who is directly accountable to and maintains regular contact with Xcerra's CEO (defendant Tacelli) to discuss operating activities, financial results, forecasts, and plans for the segment.

**The Company's Performance and Stated Expectations in the Years Preceding the Merger**

35.     On May 28, 2015, the Company announced financial results for its third fiscal quarter ended April 30, 2015.  In the earnings conference call, defendant Tacelli stated that the Company's STS segment "grew 20% quarter over quarter."  Defendant Tacelli stated that the Company continued to "see strong demand in the mobility and automotive sections of our business and it really covered all the products in the [STS] area, handling tests and our interface products."

36.     With respect to the Company's EMS segment, defendant Tacelli stated that "[e]ven though the market has been flat year over year, because of our leading position in the market in flying probe test and our technology in that area, we continue to gain share, not only geographically, but also at other accounts that we're sharing business with other competitors."

37.     The Company's Chief Financial Officer ("CFO") noted that the Company "consistently delivered positive EBITDA every quarter" since December 2013.

38.     Looking forward, defendant Tacelli stated that the Company had built a "growth engine to really drive the company to new levels over the next several years."  He stated that the Company was in "perfect position" to grow its "overall market availability by over $250 million over the next several years."

---

[4]     The PCB test segment includes operations related to design, manufacture and sale of equipment used in the testing of bare and loaded printed circuit boards.  The Probes / Pins segment includes operations related to the design, manufacture and sale of the physical devices used to connect electronic test equipment to the device under test.  The Fixtures segment includes operations related to the design, manufacture and sale of PCB test fixtures that enable the transmission of test signals from the loaded PCB to the tester.

39.     Defendant Tacelli further stated that the "key drivers for [the Company's] business over the next several years" was the Internet of Things ("IoT").  The IoT is the concept of basically connecting any device with an on and off switch to the Internet and/or to each other.  This includes everything from cellphones, coffee makers, washing machines, headphones, lamps, wearable devices, *etc*.  This also applies to components of machines, for example a jet engine of an airplane or the drill of an oil rig.

40.     Defendant Tacelli explained that the Company's management expected that the "growth of units that support this Internet of Things is going to be substantial over the next five years."  He stated that hubs, gateways and mobile devices would experience "good" growth, nodes ("things that connect the physical and digital world") would experience a "growth explosion" and there was going to be a need to test these devices quickly and at a low price.  He stated that revenue from these types of devices was going to "more than triple" over the next several years.  He stated that the Company was "uniquely positioned" to take advantage in this expected scenario, as the Company was the "only provider" that had the required technologies available "under our own roof." He stated, "We're the only ones we feel can meet the needs and the challenges of this industry in the next few years."

41.     On September 3, 2015, the Company announced financial results for its fourth fiscal quarter and fiscal year ended July 31, 2015.  The Company announced that net sales for the quarter were in line with the Company's guidance.

42.     In the earnings conference call, defendant Tacelli stated that the Company's management had a specific plan in place to "double the business over the next three to five years." Defendant Tacelli stated that Xcerra had a "[s]uccessful [a]cquisition/[m]erger [h]istory" and acquisitions was part of Xcerra's long-term growth strategy.

43.     One of the participating analysts – an analyst from Craig-Hallum Capital – noted, in response, that the Company's goal to double in size over the next three to five years indicated an expectation of a compound annual growth rate ("CAGR") between 14% and 15%.

44.     On November 24, 2015, the Company announced financial results for its first fiscal quarter ended October 31, 2015.  Defendant Tacelli stated in the press release: "The business environment softened in most business segments in which we compete.  While sales slowed more than anticipated, we were close to break-even on a non-GAAP basis due to tight control of expenses, favorable currency impact, and better than modeled gross margin performance."

45.     In the earnings conference call, defendant Tacelli stated that despite the softness in the business environment, the Company was expected to rebound, and management remained "focused on doubling the size of our company over the next three to five years."  He stated, "our long-term growth strategy for the company remains intact."

46.     With respect to IoT, he stated: "We do see continued growth in the Internet of Things, and you see some of the forecasts now are calling for a 30% growth in the number of devices that are connecting all of the different pieces in the Internet of Things, whether it's home, auto, industrial, commercial."

47.     On February 25, 2016, the Company announced financial results for its second fiscal quarter ended January 31, 2016.  Defendant Tacelli stated in the press release: "The Company continues to deliver financial results ahead of our business model and has generated positive EBITDA for the 8th consecutive quarter"; "We see recovery of our Semiconductor Test Solutions (STS) business in the April quarter . . .."

48.     In the earnings conference call, defendant Tacelli noted that the Company had "demonstrated positive EBITDA now for eight quarters in a row, gone through an entire cycle with

positive EBITDA for the company." Defendant Tacelli stated: "So what's our story all about now? It's all about growth, it's all about scale and for several quarters now we've been conveying this message that the story has three pieces." Defendant Tacelli stated that the three pieces were product innovation, expansion of the served market, and inorganic acquisitions.

49.     On June 06, 2016, the Company announced financial results for its third fiscal quarter ended April 30, 2016. The Company announced a 14% increase in net sales for the quarter compared to the prior quarter. Defendant Tacelli stated in the press release that in addition to the expected seasonal recovery, the Company "made solid progress in all aspects of our business during the quarter, especially within our Semiconductor Test Solutions segment."

50.     In the earnings conference call, defendant Tacelli stated that:

As we look forward, our growth strategy, as always, has three major elements. The first, each one of our business unit managers is focused on innovation for the market that they serve, developing best in class products and instrumentation, and leading edge technology. The second and another core element of our growth strategy is how do we expand our served markets. And we do that in multiple ways. The first is geographically, and we've seen a lot of expansion into areas like China. China is becoming a significant growth engine for the Company. Another area is on technology. You'll hear me talk a lot today about the wafer level chip scale package and the opportunity it presents and where we are with our evaluations.

You'll also see areas of new markets for the company, like flat panel display and the progress we have made in attaining some new accounts in that area, and what we expect for the future and growth. And you'll also hear me talk a lot about end-market drivers. A lot of discussion has been lately about the Internet of Things and how that really will drive significant volume of ICs moving forward, and how we believe that we are well-positioned, specifically in MEMS space to achieve a lot of that and attain a lot of that growth.

And the final piece, which we don't really talk in specifics about today but we are constantly looking at is how do we expand our business inorganically by looking at strategic acquisitions. Areas like Titan Semi, which happened about 18 months ago, we are constantly looking to expand in our contactor space, handling space, and some other areas of semiconductor test.

So, that really makes up the core strategy.

51.    With respect to IoT, defendant Tacelli stated that management continued to expect a growth explosion "over the next couple of years" and with the IoT market favoring Xcerra over its competitors.  Defendant Tacelli concluded:

> So where are we? We see growth, and we see strong momentum in the handler, the interface products in the tester space, and I think even more than that, we're seeing new markets for us start to take shape, markets that we'd not played in the past, flat panel display. We continue see the emerging technologies, and Internet of Things driving sensor applications and sensor handling solutions. We see China playing a key role in that growth, and we're continually focused on how do we develop, how do we enhance our position in China.

52.    On September 1, 2016, the Company announced financial results for its fourth fiscal quarter and fiscal year ended July 31, 2016.   Defendant Tacelli stated in the press release: "We experienced a solid quarter with earnings above the high end of guidance. In addition, we made considerable progress in several key product areas."

53.    In the earnings conference call, defendant Tacelli stated that the Company experienced "11% quarter-over-quarter sales growth."  Looking forward, defendant Tacelli stated that the Company's business was expected to continue its growth story, including, in the STS segment: (i) growth in the Semiconductor Test segment with: (a) one of the Company's products, Diamondx, with wins "across the board in China, Taiwan, Japan, and Europe," expected "to capture new customers in the U.S. in 2017," and representing close to 50% in tester group sales, surpassing the goal set several years ago of 20%, and expected to "continue to grow over the next couple of fiscal years" and (b) strong customer adoption of the flat panel display test, which was "starting to become a revenue driver and will continue to ramp as we go through 2017 and 2018"; (ii) growth in the  Semiconductor Handlers segment, with its first-to-market InCarrier Wafer Level Chip Scale Package product passing customer evaluations with "with flying colors" and starting to ramp up and contribute to revenue, and another new handler product with "very positive initial results"; and (iii) growth in the Contactors segment, with "expanding opportunities in the sensor space across the

world in China, U.S., and Europe" which "will continue to expand and continue to be a growth driver for the company as we go through 2017 and beyond."

54.     Defendant Tacelli also stated that the Company was opening a facility in China to directly capture the opportunity there: "[A]s we become a larger supplier into the China market, customers are now driving us and pushing us to become more direct in China from a technology standpoint.  So, we'll be opening a development center in China. We'll be doing that with our partner, Spirox . . .." He stated: "We expect this center to be fully staffed by the end of fiscal 2017."

55.     He also stated:

> We do maintain a very solid pipeline of acquisition targets that we research on a regular basis, but making sure that they follow the 3 criteria that we've established.  They have to complement our portfolio, they have to accelerate our top line growth, and they have to be accretive to earnings.  We will not deviate from this strategy, but I can tell you that there are opportunities out there for us that we will take advantage of.

56.     On December 1, 2016, the Company announced financial results for its first fiscal quarter ended October 31, 2016.  Defendant Tacelli stated in the press release:

> While sales were at the low end of guidance, our non-GAAP net income was at the high end.  Earnings for the quarter outperformed our model due to a favorable product mix, which generated higher gross margins.  As expected, we experienced softness in certain market segments . . . however, this was offset by strong demand for our Diamondx product . . ..  We are encouraged that our outlook for fiscal Q2 is stronger than a year ago . . ..

57.     In the earnings conference call, defendant Tacelli stated that 2017 was "shaping up [to be] a very good year for the Company."  Defendant Tacelli stated that the Company had record Diamondx revenue, its flat panel displays experienced strong demand, and the Company continued to win additional handler customers.  He stated that devices in the "automotive, mobility and Internet of Things have enabled our Semi Tests solutions revenue to perform positively year-over-year, going up 13% from 57 million in Q1 of 2016 to 65 million in 2017."

58.     Looking forward, he stated: "I'll remind everyone, we continue to stay focused on the high growth, high volume markets such as mobility and a wide range of devices, automotive, everything from controlling and sensing applications to infotainment, and the new and emerging area of Internet of Things and a wide range of applications in that area."

59.     Defendant Tacelli stated that the Company's management expected "continued growth from Internet of Things in a wide range of areas, microcontrollers, sensors and a host of other RF applications."

60.     Defendant Tacelli stated that the Company continued to expect growth in China and reminded investors that "we are not putting these resources in and hoping the business comes, these are customers saying we had a lot of new designs, we want to work with you on."

61.     He also reminded investors that fiscal Q2 was "typically a seasonally weak quarter for the Company and for the industry" but that the Company's management remained confident in future revenue growth and share growth in the overall market.  He stated:

> [W]e will not stray from our strategy, our three-point strategy, and that is intact.  We will look to acquire businesses that complement our portfolio, accelerate our growth through using our global distribution and are accretive to earnings.  And I will tell you that there is a good pipeline of opportunities in front of us.

62.     On February 21, 2017, the Company announced financial results for its second fiscal quarter ended January 31, 2017.  Defendant Tacelli stated in the press release:

> We had a solid Q2, with revenue at the higher end of our guidance but more importantly earnings above our business model.  Early in January we started to see positive business trends developing and those have accelerated into our third fiscal quarter.  This includes strength in both our Semi Test Solutions (STS), as well as our Electronics Manufacturing Solutions (EMS) business segments.

63.     In the earnings conference call, defendant Tacelli stated that:

> Total sales for the quarter were up 11% year-over-year.  This was mainly driven by our Semiconductor Test Solutions Group which showed very good strengthening up 16% over that span of same time.  This more than offset a weakness in our Electronics Manufacturing Solutions Group which was down 8% year-over-

- 13 -

year.  The positive thing here is we've already started to see some rebound in our EMS group.

64.     He stated: "As we look out to Q3, we look forward, Q3 outlook our revenue is up 18% year-over-year and just as important it is up 21% over Q2."

65.     He stated: "In our Semiconductor Test Solutions business we're seeing very strong ramp across all the different products in that business unit."

66.     He stated: "And China and Taiwan continue to play a major role and that's one of the reasons why we've continued to invest in that business and also make a decision to go direct in that region."

67.     He stated:

If I look at the three unique opportunities for the company over the next few years I've already talked about the success story of flat-panel display, we expect that to continue as we go through 2017 and 2018, really being a big driver, a new driver of revenue for the company.  In addition to that, another growth engine is our expansion into MEMS and sensors with our complete test cell.  And we've seen that become the case in all different geographies for a wide range of IOT type devices and that's happened in the U.S., Europe and in Asia.

68.     He stated: "And we're looking at new markets and new instrumentation to be able to grow our base over the next couple of years.  What all this leads to is solid financial performance, our growth in EBITDA and profitability, our growth in topline revenue and our expansion into like I said new markets."

69.     Following the announcement of the Company's first quarter results, the Company's stock price closed at $9.03.

**The Sales Process and the Company's Financial Projections**

70.     Starting from around May 2015, the Company's management had numerous discussions with Fastprint Hong Kong Co., Ltd., a wholly owned subsidiary of Shenzhen Fastprint Circuit Tech Co., Ltd., and its affiliates (collectively "Fastprint") – referred to as Party A in the

Proxy – concerning: (i) the sale of the Company's semiconductor test interface board business based in Santa Clara, CA ("Interface Board Business") to Fastprint; and (ii) Fastprint's interest in helping the Company grow its business in China, including through a joint venture.

71.     On December 1, 2015, the Company announced that it completed the sale of its Interface Board Business to Fastprint.

72.     On December 10, 2015, defendant Tacelli and the Company's vice president of investor relations had an introductory meeting with Cowen.  Cowen pitched its services concerning the Company pursuing strategic opportunities in China.

73.     At a February 26, 2016 meeting – after defendant Tacelli told investors that management had a long-term growth plan to "doubl[e] the size of our company over the next three to five years" – the Board discussed "the Company's business opportunities and strategy for growth." All Individual Defendants were present in this Board meeting.

74.     On March 30, 2016, defendant Tacelli and other members of management met with Cowen again.

75.     At an April 13, 2016 meeting, the Board agreed with management to hire Cowen as a financial advisor in exploring strategic alternatives with certain Chinese companies.  All Individual Defendants were present at this Board meeting.

76.     Subsequently, Cowen contacted eight Chinese companies (Sino IC Capital and the companies referred to as Party B, Party C, Party D, Party E, Party F, and Party G in the Proxy). Cowen did not contact Fastprint.

77.     Around this time, management began preparing financial projections for a potential merger.  Traditionally, management prepared financial projections in May or June for the immediately succeeding fiscal year (the "Annual Operating Plan" or the "AOP").  The AOP,

prepared in the normal course of business, was a thorough forecast based on a bottoms-up approach with input from the managers of each of the Company's business units, was a part of the Company's annual internal planning and performance goal setting process, and was discussed, reviewed and approved by the Board annually.

78.    In May 2016, specifically in connection with the merger discussions, management took the AOP and added on two additional years.  The three-year financial projections (the "May 2016 Forecast") assumed the following in revenues:

|  | 2017 | 2018 | 2019 |
|---|---|---|---|
| Total Revenue | $398 | $445 | $481 |
| *YoY Growth Rate* | 22.8% | 11.8% | 8.1% |

79.    According to the Proxy, the May 2016 Forecast "was prepared on a stand-alone basis and therefore does not reflect any effect of a potential acquisition of the Company by Sino IC Capital, any of its affiliates or related parties or any other party or any other strategic transaction involving the Company."

80.    At the June 2, 2016 meeting, the Company's management presented the May 2016 Forecast to the Board.  All Individual Defendants were present.

81.    On August 19, 2016, Sino IC Capital submitted an indication of interest in acquiring the Company for $7.75 per share in cash.[5]

82.    In August 2016, management revised the May 2016 Forecast downwards.  Despite having no mention of any lowered expectations at the Company's June 06, 2016 earnings call,

---

[5]    This offer represented a 27.5% premium to the closing price of the Company's common stock on August 19, 2016, which was $6.08 per share.

management prepared a revised set of projections assuming a 7% **_decrease_** in projected revenue for 2017 (the "August 2016 Forecast").

83.    At the August 25, 2016 meeting, the Company's management presented the August 2016 Forecast to the Board.  All Individual Defendants were present.[6]

84.    Despite the lowered August 2016 Forecast, the Board could not find the Sino IC Capital's $7.75 offer within the range of acceptableness.  The Board discussed that the price should be close to $14.00 per share.[7]

85.    On September 1, 2016, Party G indicted an interest in a joint venture with the Company in China.  Defendant Tacelli and his management team told Party G that the Company was not interested in a joint venture.

86.    On September 15, 2016, Sino IC Capital submitted a revised verbal offer for $8.50 per share.[8]

87.    Throughout September and October 2016, defendant Tacelli and his management team continued to hold discussions and meetings with Sino IC Capital without any Board involvement.

88.    On November 7 and 18, 2016, as the Company's stock continued to steadily rise, Sino IC Capital submitted revised verbal offers of $9.25 per share and $9.55 per share, respectively.[9]

---

[6]    The Proxy does not indicate any Board member was absent for this meeting.  In other parts of the Proxy, the Proxy explicitly indicates when a Board member was absent for a Board meeting.

[7]    This price represented a 130% premium to the closing price of the Company's common stock on August 19, 2016, which was $6.08 per share.

[8]    This price represented a 49.6% premium to the closing price of the Company's common stock on September 15, 2016, which was $5.68 per share.

89.     At a November 18, 2016 meeting, the Board agreed that the $9.55 offer was in the "best interests of the Company and its stockholders."   All Individual Defendants excluding defendant Wright attended this meeting, with defendant Tacelli representing defendant Wright's support of the potential merger.

90.     On November 28, 2016, Sino IC Capital submitted a written offer for $9.55 per share.

91.     At a November 29, 2016 meeting, the Board received a preliminary valuation analysis of the Company from Cowen, and agreed to exclusive negotiations with Sino IC Capital at the $9.55 per share price.  All Individual Defendants attended this meeting, with defendant Titinger joining late.

92.     In January and February 2017, the Company's management continued to negotiate non-price merger terms with Sino Capital IP.

93.     After the Company's February 21, 2017 announcement of its second fiscal quarter results, the Company's stock price closed at $9.03.

94.     Around this time, management revised the August 2016 Forecast for fiscal 2017 (the "February 2017 Forecast").   The February 2017 Forecast reflected slightly decreased operating expenses for fiscal year 2017, as compared to the August 2016 Forecast, resulting from Company management's updated cost assumptions for fiscal year 2017 and slightly increased EBITDA as a result thereof.

95.     On February 23, 2017, defendant Tacelli and the Company's CFO discussed "employee retention matters" with Sino IC Capital.

---

[9]     These offers represented: (i) a 68.2% premium to the closing price of the Company's common stock on November 7, 2016, which was $5.50 per share; and (ii) a 45.1% premium to the closing price of the Company's common stock on November 18, 2016, which was $6.58 per share.

96.     At a February 23, 2017 meeting, management presented the February 2017 Forecast and Cowen provided an updated preliminary valuation analysis of the Company to the Board.  All Individual Defendants were present.

97.     On February 24, 2017, defendant Tacelli recognized how it would look to move forward on the $9.55 offer despite the increases in the Company's stock price, and discussed with Sino IC Capital a higher offer.

98.     On March 1, 2017, defendant Tacelli and the Company's CFO met with Sino IC Capital and discussed, among other things, employee retention.  During the meeting, the parties discussed the recent performance of the Company's stock price and Sino IC Capital verbally indicated a revised offer of $9.55 to $10.25 per share.[10]

99.     This offer represented the lowest premium to date:

| Date of offer | Offer | Closing Stock price | Premium |
|---|---|---|---|
| 8/19/16 | $7.75 | $6.08 | 27.5% |
| 9/15/16 | $8.50 | $5.68 | 49.6% |
| 11/7/16 | $9.25 | $5.50 | 68.2% |
| 11/18/16 | $9.55 | $6.58 | 45.1% |
| 11/28/16 | $9.55 | $6.76 | 41.3% |
| 3/1/17 | $9.55 - $10.25 | $8.91 | 7.2% - 15% |

100.    On March 2, 2017, Cowen met with Sino IC Capital's financial advisor to discuss the treatment of restricted stock units under the draft merger agreement.

---

[10]   This offer represented a 41.3% premium to the closing price of the Company's common stock on November 25, 2016, which was $8.91 per share.

101.    Around this time, management and/or Cowen took the February 2017 Forecast and added on an additional three years.  These five-year projections, *i.e.*, the Extended Forecast, assumed a cliff-dive in growth in the added last three years:

|  | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| Total Revenue | $369.5 | $445 | $481 | $490.6 | $500.4 | $510.4 |
| *YoY Growth Rate* | 14% | 20.4% | 8.1% | 2% | 2% | 2% |

102.    According to the Proxy, the Extended Forecast "was prepared on a stand-alone basis and therefore does not include any transaction-related expenses nor does it reflect any effect of an acquisition of the Company by Parent, any of its affiliates or any other party or any other strategic transaction involving the Company."

103.    On April 7, 2017, the Board held a meeting.  All Individual Defendants were present. Cowen provided its financial analyses to the Board as disclosed, in summary, on pages 64-70 of the Proxy.  Cowen's financial analyses were based, as "instructed," on the Extended Forecast.  Based on the Extended Forecast, Cowen provided its opinion to the Board that the $10.25 per share offer was fair, from a financial point of view for the Company's shareholders.  Based on Cowen's fairness opinion, the Board stated that the terms of the Acquisition were "fair to, advisable and in the best interests of the Company and its stockholders."   At the conclusion of the meetings, the Board unanimously determined to approve the Acquisition and recommend the Acquisition to the Xcerra's shareholders for approval.

104.    On April 10, 2017, Xcerra filed an 8-K, announcing that it had entered into a merger agreement with Unic Capital Management Co., Ltd., an affiliate of Sino IC Capital, pursuant to which Sino IC Capital agreed to acquire Xcerra for $10.25 per share in cash.

105.    Exhibit 99.1 to the April 10, 2017 8-K was the press release announcing the Acquisition, which stated:

**Xcerra Corporation to be Acquired for Approximately $580M by Unic Capital Management Co., Ltd, an Affiliate of Sino IC Capital**

- **All cash transaction at $10.25 per share**

- **Private ownership will enhance Xcerra's growth prospects and support long term investment in new and existing markets, new product development, and stronger customer relationships**

- **Xcerra will remain a global company headquartered in Norwood, Massachusetts, USA**

**NORWOOD, MA, April 10, 2017** – Xcerra Corporation (NASDAQ:XCRA) and Sino IC Capital Co. Ltd. today announced that Xcerra and an affiliate of Sino IC Capital, Unic Capital Management Co., Ltd., have entered into a definitive agreement under which Unic Capital Management Co., Ltd., will acquire all outstanding shares of Xcerra for $10.25 per share in cash. The transaction price represents approximately a 16 percent premium to Xcerra's average closing price over the 30 trading day period ending April 7, 2017, approximately a 28 percent premium to Xcerra's average closing price over the 90 trading day period ending April 7, 2017, and values Xcerra's equity at approximately $580 million on a fully diluted basis.

Xcerra's Board of Directors has unanimously approved the transaction. Xcerra expects no changes to the day-to-day operations of the company and expects that Xcerra's existing management will continue to run the company.

Xcerra Corporation designs and manufactures test equipment and other related products for testing semiconductors and printed circuit boards, which are used in a variety of commercial industries including consumer electronics, automotive, and industrial. Xcerra does not design or manufacture semiconductor devices; Xcerra sells test and handling equipment and related products to semiconductor designers and manufacturers who use Xcerra products to test their devices during the manufacturing process.

Dave Tacelli, president and chief executive officer of Xcerra said: "The partnership we have announced today with Sino IC Capital will deliver strong value for our shareholders and will also benefit our customers and employees. With the financial backing of such a prominent and respected private equity fund, Xcerra will be well positioned for future growth, both in new and existing markets. We believe this partnership will enable the company to make long term investments in innovation and product development as well as broaden and strengthen our customer relationships around the world."

*      *      *

Mr. Jun Lu, president of Sino IC Capital, added, "Xcerra's leadership team and employees have delivered quality products and innovations to their customers and the marketplace for over four decades.  Our partnership with and investment in Xcerra will help build on this track record of success and accelerate the company's ability to access new markets, develop new product lines, and serve more customers. We value the entire Xcerra team and are committed to keeping the company's headquarters in Norwood, Massachusetts. Sino IC Capital and Xcerra will work closely together with regulators, in an open and transparent manner, as they evaluate the merits of the transaction."

The transaction is subject to a number of conditions, including approval by Xcerra's shareholders as well as antitrust and other regulatory approvals including from relevant authorities in China and from the Committee on Foreign Investment in the United States (CFIUS).  The transaction is currently expected to close before the end of the calendar year.

The merger agreement includes a "go-shop" period, during which Xcerra will actively solicit alternative proposals from third parties for the next 35 days continuing through May 12, 2017. The merger agreement requires Xcerra to pay a termination fee of $14,250,000 to an affiliate of Sino IC Capital if Xcerra terminates the merger agreement in connection with a superior offer that arose during the go-shop period and a termination fee of $22,800,000 if Xcerra terminates the merger agreement in connection with a superior proposal that arose following the go-shop period. There can be no assurance that this process will result in a superior proposal. Xcerra does not intend to disclose developments with respect to the solicitation process unless and until its Board of Directors has made a decision with respect to any potential superior proposal.

Cowen and Company, LLC is serving as Xcerra's financial advisor and Latham & Watkins LLP is serving as Xcerra's legal advisor. Grant Thornton International is serving as Sino IC Capital's accounting advisor and Wilson Sonsini Goodrich & Rosati is serving as Sino IC Capital's legal advisor.

106.   Exhibit 99.3 to the April 10, 2017 8-K was a presentation titled "Xcerra To Become a

Private Company."  In the presentation, defendants stated:

- that the President of Sino IC Capital stated that "[w]e value the entire Xcerra team and are committed to keeping the company's headquarters in Norwood, Massachusetts";

- "We expect no changes to the day-to-day operations of the company";

- "Sino IC Capital is a financial investor, we expect no consolidation of product lines, offices and functions"; and

- 22 -

- "We expect Xcerra's existing management to continue to run the company."

107.    Exhibit 99.9 to the April 10, 2017 8-K was a copy of Xcerra's communications "Messaging Framework," which stated:

- "Dave Tacelli will remain as president and CEO and Mark Gallenberger will remain as SVP, CFO, and COO and Pascal Ronde will remain as SVP Global Customer Team"; and

- "We expect the remainder of the management team and the organization to remain the same."

**The False and Misleading Proxy**

108.    On September 5, 2017, defendants filed and disseminated the Proxy to the Company's shareholders.  The Proxy was a formal document filed with the SEC in connection with a cash-out merger and purportedly set forth the recommendation of each Individual Defendant in favor of the Acquisition and the reasons why each Individual Defendant believed that the Acquisition "was in the best interests of the company and its stockholders."

109.    In the Proxy, defendants stated that $10.25 per share offer was superior to the value of the Company's stock, taking into consideration the expected future performance of the Company. *See* Proxy at 51 (stating that "none of these alternatives [referring to alternatives to the Merger, including remaining an independent publicly-traded company] was reasonably likely to present a superior opportunity for the Company to create greater value for the Company's stockholders"); *id.* at 52 (listing as a factor supporting the Board's Merger decision, "estimated forecasts of the Company's future financial performance prepared by the Company's management, together with management's view of the Company's financial condition, results of operations, business, prospects and competitive position and the ability to achieve the performance set forth in such forecasts").

110.    In that context, in the Proxy, defendants represented that the Extended Forecast reflected management's best estimates concerning the future performance of the Company.  On page

59, the Proxy stated that: "Cowen was instructed to use and rely on the Extended Forecast as the basis for its analyses . . .."  On page 63, the Proxy stated:

> Cowen, **with the consent of the Board**, assumed that the Company Forecasts were reasonably prepared by the management of the Company on bases reflecting the best currently available estimates and good faith judgments of such management as to the future performance of the Company, and that such forecasts provided a reasonable basis for its opinion.

111.    However, the Extended Forecast did **not**, in fact, reflect management's best estimates concerning the future performance of the Company.

112.    The Extended Forecast assumed strong growth rates for the first few years, but then, an abrupt cliff-drive in growth, and a 2% growth rate – slower than the current GDP – for the last three years.

113.     This growth trajectory assumption is inconsistent with the Company's performance and the numerous statements by defendant Tacelli and the Company's management in the years preceding the Merger.  *See supra* ¶¶35-104.

114.    The Company's management consistently stated from May 2015 to April 2017 that the Company had a specific strong growth strategy planned and being implemented, and that the Company was primed for significant growth in the future.  The Company's management stated that the Company was just in the beginning stages of its growth story, but that the Company was already demonstrating successful growth into new markets and customers.  The Company's management stated that it had opened a facility in China to directly capture the opportunity, and that the facility would open "by the end of fiscal 2017" and the Company would begin to ramp up its presence in China.  The Company's management consistently stated that there was another growth explosion and ramp up in the near future with development in the IoT market.

115.    Most conspicuously, during the numerous times the Company's management discussed the Company's long-term plan and expectations, the Company's management **never** stated

or gave *any* indication that they actually believed that Xcerra's growth story would be short, Xcerra would hit a brick wall in the next two years and/or that Xcerra's growth potential was limited and its end was in the foreseeable future.

116.     In fact, when defendant Tacelli specifically stated that management's plan was to double the size of the Company over the next three-to-five years, an analyst following the Company responded that that plan reflected an expectation of a compound annual growth rate ("CAGR") between 14% and 15% – and defendant Tacelli (nor any of the other members of the Company's management) did *not* speak up and correct the analyst to say that management only expected that level of growth rate to be sustained for the first half of the five year period, and in the latter years, the growth was expected drop significantly to 2%.

117.     Moreover, in the Proxy, despite changing their tune regarding Xcerra's growth expectations, management offers *no* explanation providing a reasonable basis for the significant disparity in growth from the earlier periods.  The management's silence is indicative that there is no reasonable basis.[11]

118.     Each Individual Defendant was aware that the Extended Forecast was based on this unreasonable, unrealistic growth trajectory assumption.  Each Individual Defendant was present at the Board meeting where management presented the Extended Forecast.

119.     Moreover, each Individual Defendant was aware of the timing and circumstances of the development of and revisions to the Company's projections leading to the Extended Forecast. The Extended Forecast was developed – as admitted by defendants – specifically in connection with the Merger.  *See* Proxy at 55 ("In connection with the Merger and the other transactions

---

[11]   Moreover, in the press release announcing the Acquisition, defendants state that "[p]rivate ownership will enhance Xcerra's growth prospects" without stating that these "growth prospects" were actually extremely limited, and there were no long-term growth prospects.

contemplated by the Merger Agreement, the Company's management updated and expanded certain financial forecasts regarding the Company (for the purposes of this section, the "Forecasts" means each of the May 2016 Forecast, August 2016 Forecast, February 2017 Forecast and the Extended Forecast, each as described below)").

120.    Management added on additional years with significantly lowered growth in direct *response* to Sino Capital IC's offers.  Management developed the unreasonable growth trajectory in the outer years *after* defendants agreed to exclusivity with Sino IC Capital, *after* management decided to sell to Sino IC Capital, shortly before presenting the fairness opinion to the Board, specifically in order to be able to obtain a fairness opinion on the $10.25 offer.

121.    By assuming significantly lowered growth in the last three years, the Extended Forecast was able to lower the overall valuation of the Company.  By lowering the overall valuation of the Company, Cowen was able to provide a fairness opinion for the $10.25 offer from Sino IC Capital, even though the $10.25 per share consideration did not adequately reflect the true value of the Company.

122.    Each Individual Defendant either participated in deriving the Extended Forecast (and thus was directly responsible for the flawed assumption underlying the Extended Forecast) or was presented with the Extended Forecast at a Board meeting (and thus had knowledge of the flawed assumption underlying the Extended Forecast, and the merger-related purposes of the Extended Forecast).

123.    Each Individual Defendants had a material incentive to recommend the Acquisition. Defendant Tacelli and his management team are set to secure continuing employment and titles in the post-merger entity.  Moreover, being sold to a private equity fund, defendant Tacelli and his management team are most likely to receive equity interests in the post-merger private company.

The Individual Defendants (and the Company's management) are also poised to receive **tens of millions of dollars** in special payments for their previously locked-up shares through the immediate and full vesting of equity awards and other change in control benefits.

124.    By falsely stating that the Extended Forecast reflected management's best estimates concerning the future performance of the Company, the Individual Defendants induced stockholders to accept the $10.25 offer from Sino IC Capital, even though the $10.25 per share consideration did not adequately reflect the true value of the Company.  At least one Wall Street analyst, for example, had a $12.00 price target.

125.    In addition to the false and misleading statement regarding the Extended Forecast, as discussed above, in the Proxy, defendants also failed to disclose information in their possession showing that Cowen's fairness opinion was fundamentally flawed.

126.    In the Proxy, the Individual Defendants represented that Cowen's fairness opinion supported defendants' position.  *See* Proxy at 52 (listing as a factor supporting the Board's Merger decision, "the financial analyses presented to the Board by Cowen with respect to the Merger and the written opinion of Cowen to the Board").

127.    Any reasonable investor would have expected, under these circumstances, that Cowen's valuation analyses was valid.

128.    Cowen's valuation analyses, however, was not valid because it was based on the Extended Forecast and assumed the Extended Forecast reflected management's best estimates concerning the future performance of the Company, when they did not.

129.    Each Individual Defendant was present at the Board meeting Cowen presented its analyses and informed the Board that its valuation and fairness opinion was based on the Extended Forecast.  Thus, the Individual Defendant knew that the Cowen's valuation analyses were

fundamentally flawed at the time they stated that Cowen's valuation analyses supported the Board's recommendation on the Merger.

130.    Had this information been disclosed, the Company's stockholders would be inclined to reject Cowen's fairness opinion and the Board's recommendation of the Merger.

131.    This omission rendered the following specific statements in the Proxy misleading:

- the statements of opinion that the Merger price was fair and the Merger was in the stockholders' best interests misleading (Proxy at 6, 14, 22, 50);

- the qualitative statements representing the "greater value" of Sino IC Capital's $10.25 offer price (Proxy at 51);

- the summary of Cowen's DCF analyses (Proxy at 69); and

- statement suggesting that a valid valuation of the Company's stock resulted in a valuation "from $8.85 to $11.04" (Proxy at 69).

132.    On October 12, 2017, defendants held a special meeting of shareholders to obtain the approval of the Acquisition.

133.    On October 13, 2017, Xcerra filed a Form 8-K with the SEC stating that the Company's shareholders, upon the recommendation of the Company's Board, voted in favor of the Acquisition at the Special Meeting.

## COUNT I

### For Violations of §14(a) of the 1934 Act and Rule 14a-9
### Promulgated Thereunder Against the Individual Defendants and Xcerra

134.    Plaintiff repeats and realleges each allegation set forth herein.

135.    The Individual Defendants and Xcerra disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

136.   The Proxy was prepared, reviewed and/or disseminated by the Individual Defendants and Xcerra.  It misrepresented and/or omitted material facts, including material information about the value of the Company's stock and the unfair consideration offered in the Acquisition.

137.   In so doing, the Individual Defendants and Xcerra made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.  By virtue of their positions within the Company, the Individual Defendants and Xcerra were aware of this information and of their duty to disclose this information in the Proxy.

138.   The Individual Defendants and Xcerra were at least negligent in filing the Proxy with these materially false and misleading statements.

139.   As a direct result of defendants' negligent preparation, review, and dissemination of the false and/or misleading Proxy, plaintiff and the Class were induced to vote their shares and accept the inadequate consideration of $10.25 per share in connection with the Acquisition.  The false and/or misleading Proxy used to obtain shareholder approval of the Acquisition deprived plaintiff and the Class of their right to a fully informed shareholder vote in connection therewith and the full and fair value for their Xcerra shares.  At all times relevant to the dissemination of the materially false and/or misleading Proxy, defendants were aware of and/or had access to the true facts concerning Xcerra's true value, which was far greater than the $10.25 per share Xcerra's shareholders are being offered.  Thus, as a direct and proximate result of the dissemination of the false and/or misleading Proxy defendants used to obtain shareholder approval of and thereby are attempting to consummate the Acquisition, plaintiff and the Class have suffered and will suffer damage and actual economic losses (*i.e.*, the difference between the price offered to Xcerra

shareholders and Xcerra's true value at the time of the Acquisition) in an amount to be determined at trial.

140.     The omissions and false and misleading statements in the Proxy were material in that a reasonable shareholder would consider them important in deciding how to vote on an acquisition. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in a proxy and in other information reasonably available to shareholders.  The false and misleading Proxy had the intended effect: a materially misinformed vote of the Xcerra shareholders, who voted in favor of the Acquisition on October 12, 2017.

141.     By reason of the foregoing, the Individual Defendants and Xcerra have violated §14(a) of the 1934 Act and SEC Rule 14a-9(a) promulgated thereunder.

142.     Because of the false and misleading statements in the Proxy, plaintiff and the members of the Class have been harmed.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants

143.     Plaintiff repeats and realleges each allegation set forth herein.

144.     The Individual Defendants acted as controlling persons of Xcerra within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Xcerra and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.

- 30 -

145.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

146.     As the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing and/or approving the Acquisition.  The Proxy purports to describe the various issues and information that they reviewed and considered, descriptions which had input from the Individual Defendants.   The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Acquisition.  They were thus directly involved in the making of this document.

147.     By virtue of the foregoing, the Individual Defendants have violated §20(a) of the 1934 Act.

148.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated §14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, Xcerra shareholders have been harmed.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment, in plaintiff's favor and in favor of the Class and against defendants, as follows:

A.     Declaring that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying plaintiff as Class representative and plaintiff's counsel as Class counsel;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members

against all defendants, jointly and severally, for all damages sustained as a result of defendants'

wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class pre-judgment and post-judgment interest, as well as

reasonable attorneys' fees, expert witness fees and other costs; and

D.      Granting such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  November 10, 2017                   BLOCK & LEVITON

 

                                            /s/ Jason M. Leviton
                                            JASON M. LEVITON (BBO# 678331)
                                            BRADLEY J. VETTRAINO (BBO# 691834)
                                            155 Federal Street, Suite 400
                                            Boston, MA  02110
                                            Telephone:  617/398-5600
                                            Fax:  617/507-6020

                                            ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            RANDALL J. BARON
                                            DAVID WISSBROECKER
                                            EUN JIN LEE
                                            655 West Broadway, Suite 1900
                                            San Diego, CA  92101-8498
                                            Telephone:  619/231-1058
                                            Fax:  619/231-7423

                                            JOHNSON FISTEL, LLP
                                            FRANK J. JOHNSON
                                            600 West Broadway, Suite 1540
                                            San Diego, CA  92101
                                            Telephone:  619/230-0063
                                            Fax:  619/255-1856

                                            Attorneys for Plaintiff